Michael Ned MATHIAS, f/k/a Nenad Matijasevic, Plaintiff,

v.

Bradley S. JACOBS, Defendant.

No. 99 Civ.2004 VM JCF.

United States District Court,
S.D. New York.

Sept. 27, 2001.

Patrick M. Reilly, Delbello Donnellan Weingarten & Tartaglia, LLP, White Plains, NY, for plaintiff.

Leslie A. Lupert, Orans, Elsen & Lupert, New York, NY, for defendant.

*DECISION AND ORDER*

MARRERO, District Judge.

Michael Mathias ("Mathias"), formerly known as Nenad Matijasevic, brought this diversity action against Bradley Jacobs ("Jacobs"), seeking monetary damages and specific performance for breach of contract. Amended Complaint ("Compl."). Mathias claims that Jacobs refused to honor a 1992 Stock Options Agreement (the "Options Agreement"). Jacobs's answer raised three affirmative defenses: (1) Mathias violated a non-competition provision of the Options Agreement, thereby surrendering his right to exercise the options; (2) Mathias secured Jacobs's assent as a result of duress; and (3) Mathias failed to tender payment in the manner prescribed by the Options Agreement. Amended Answer ("Ans.") ¶¶ 21–28. Jacobs also asserted a permissive counterclaim alleging that Mathias owed him $50,000 on a personal loan. *Id.* at ¶¶ 29–35.

Discovery proceeded before Magistrate Judge James Francis. Jacobs moved to dismiss the complaint or, in the alternative, for an adverse inference against Mathias on the grounds that Mathias had destroyed evidence and misled the court. By letter to Magistrate Judge Francis, Mathias moved for sanctions against Jacobs in connection with the depositions of Richard Weingarten ("Weingarten") and Alfred DelBello ("DelBello"), both partners of the firm representing Mathias. The parties cross-moved under Fed.R.Civ.P. 56(b) for summary judgment.

Magistrate Judge Francis found that Mathias had destroyed evidence but declined to recommend dismissing the complaint or drawing an adverse inference, instead ordering Mathias to pay Jacobs $28,271.75 for the costs incurred as a result of the spoliation. Magistrate Judge Francis also found that there was no reasonable basis for Jacobs to conduct the Weingarten deposition or to pursue questions related to the duress defense at the Delbello deposition. He therefore granted Mathias's motion for discovery sanctions, ordering Jacobs's attorneys to pay opposing counsel and the two deponents a total of $1,723.90. *See* Memorandum and Order, *Mathias v. Jacobs,* 197 F.R.D. 29 (S.D.N.Y. 2000) (Francis, M.J.).

Jacobs filed timely objections to Magistrate Judge Francis's Memorandum and Order. Mathias filed his opposition to Jacobs's objections.

For the reasons discussed below, Mathias's motion for summary judgment is granted, Jacobs's cross-motion for summary judgment is denied, and Magistrate Judge Francis's order imposing sanctions against Jacobs's attorneys is vacated.

## I. BACKGROUND

In the 1980's, Mathias and Jacobs worked together in the oil brokerage business in London. In 1989, Jacobs launched a waste management business which eventually became United Waste Services, Inc. ("United Waste"). Mathias worked amicably for United Waste from 1989 until some time in 1992. Disagreement then arose about whether Jacobs had ever promised Mathias an ownership stake in the company. On June 1, 1992, Mathias and Jacobs seemingly resolved this dispute by entering into two contemporaneous agreements, one terminating Mathias's employment with United Waste (the "United Waste Agreement") and other granting him stock options in United Waste (the "Stock Options Agreement" or "Options Agreement").

The United Waste Agreement provided Mathias with a lump sum of $31,200 in back pay, and, for a two-year period, monthly payments of $8,000 and continuing health insurance coverage. In return, Mathias agreed to several non-compete provisions, specifically promising, among

other things, to not (1) disclose any of United Waste's confidential information; (2) work for or own an interest in a company that competes with United Waste; or (3) "speak to or correspond or have any contact whatsoever with" three categories of persons and entities, including (i) those who had, or were prospects for, a business relationship with United Waste; (ii) any United Waste employees or officers, or their families; and (iii) any company that was a possible acquisition by United Waste. *Id.* at ¶¶ 4–5.

The Stock Options Agreement granted Mathias the right to purchase 400,000 shares of United Waste stock, exercisable at $3.00 per share anytime between June 1, 1994 and May 31, 1999. *See* Stock Options Agreement at ¶ 1. The Options Agreement incorporated by reference the non-compete provisions of the United Waste Agreement. *Id.* at ¶ 2. Further, the Options Agreement provided that the options would be "automatically and unconditionally rescinded and terminated" if Mathias breached the non-compete provisions. *Id.* at ¶ 2(b).

On March 8, 1999, Mathias attempted to exercise the option by tendering a check for $1.2 million, the amount prescribed in the Options Agreement, but Jacobs refused to accept it. Mathias consequently filed this action to recover damages totaling the value of the stock shares on the day Jacobs breached (minus the $1.2 million Mathias was required to pay), plus interest, in addition to specific performance for delivery of the stock shares.

## II. *SUMMARY JUDGMENT*

In moving for summary judgment, Jacobs argues that Mathias repeatedly breached Paragraph 5(b), or the "no-contact clause," of the non-compete provisions and thereby relinquished the right to exercise the stock options. Mathias counters that Paragraph 5(b) is unenforceable as overbroad and against public policy.

## A. *LEGAL STANDARD FOR SUMMARY JUDGMENT*

A motion for summary judgment may be granted only if there is no genuine issue as to any material fact and the moving party therefore is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56. The role of the Court is to determine whether there are any genuine issues of material fact to be tried, not to decide them. *See Gallo v. Prudential Residential Svcs., Ltd. Partnership,* 22 F.3d 1219, 1224 (2d Cir. 1994). In considering the motion, a court must resolve ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## B. *THE NATURE OF THE STOCK OPTIONS AGREEMENT*

Historically, New York courts refused to enforce restrictive covenants on the ground that they constituted restraints on trade. *DAR & Assocs., Inc. v. Uniforce Servs., Inc.,* 37 F.Supp.2d 192, 196 (E.D.N.Y.1999). "More recently, however, courts have held that in some situations it is both desirable and essential to enforce restrictive covenants." *Id.* Restrictive covenants in three types of contracts have been recognized as enforceable: (1) contracts for the sale of businesses; (2) employment contracts; and (3) ordinary commercial contracts. *Id.* at 196–97.

A restrictive covenant in a contract for the sale of a business limits the seller's right to launch a new enterprise which competes with the business sold. *See Chevron U.S.A., Inc. v. Roxen Serv., Inc.,* 813 F.2d 26, 28–29 (2d Cir.1987). Restric-

tive covenants in this context are routinely enforced because the buyer has in part bargained for the good will of the seller's customers. *Id.* at 29; *Purchasing Assocs. v. Weitz*, 13 N.Y.2d 267, 246 N.Y.S.2d 600, 196 N.E.2d 245 (1963). If the seller is permitted to initiate a competing enterprise, which presumably would attract the patronage of the seller's former customers, the buyer would not receive the full benefit of her bargain.

■ Courts analyze restrictive covenants in ordinary commercial contracts, such as a licensing agreement, "under a simple rule of reason, balancing the competing public policies in favor of robust competition and freedom to contract." *DAR & Assocs., Inc.*, 37 F.Supp.2d at 197. Courts typically consider the legitimate business interests protected by the covenant, the reasonableness of the covenant, and the degree of hardship imposed upon the party against whom the covenant is enforced. *Id.* at 198–200.

■ Restrictive covenants in employment contracts, however, are subject to more exacting scrutiny than are those in contracts for the sales of business or ordinary commercial contracts. *See DAR & Assocs., Inc.*, 37 F.Supp.2d at 196–97. Public policy favors economic competition and individual liberty and seeks to shield employees from the superior bargaining position of employers. *See Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 70 (2d Cir.1999); *Reed, Roberts Assocs., Inc. v. Strauman*, 40 N.Y.2d 303, 386 N.Y.S.2d 677, 353 N.E.2d 590 (1976).

Mathias argues that the Stock Options Agreement coupled with the United Waste Agreement constitute the contract which terminated his affiliation with United Waste. Consequently, Mathias contends that the enforceability of Paragraph 5(b), which is memorialized in the United Waste Agreement and incorporated by reference into the Options Agreement, must be ana-

lyzed according to the more demanding standards of restrictive covenants in employment contracts.

Jacobs views the Options Agreement not as an employment contract, but as an ordinary commercial contract—more specifically, a settlement agreement. According to Jacobs, the Options Agreement is autonomous of the United Waste Agreement, and was devised merely to resolve the dispute regarding Mathias's claim to an ownership interest in United Waste. Jacobs therefore advocates applying the simple rule of reason test of ordinary commercial contracts.

This Court need not decide the nature of the contract at issue. It concludes that under either construction, the challenged portions of the non-compete provisions are overbroad and unrelated to any legitimate United Waste business interest, and therefore unenforceable.

### C. *THE ENFORCEABILITY OF THE NO–CONTACT CLAUSE*

#### 1. *Analysis of the Options Agreement as an Employment Contract*

■ As described above, courts carefully review restrictive covenants in employment contracts. Given the preference for competition and for a person to apply in a new job the skills and capacities developed in prior employment, restrictive covenants in employment contracts are enforced only if they are reasonable and necessary to protect valid business interests. *See Reed, Roberts Assocs., Inc.*, 40 N.Y.2d at 307, 386 N.Y.S.2d 677, 353 N.E.2d 590; *Ticor Title Ins. Co.*, 173 F.3d at 70. A restrictive covenant in an employment contract is enforced "only if it (1) is *no greater* than is required for the protection of the *legitimate interest* of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." *BDO Seidman v. Hirshberg*, 93 N.Y.2d

382, 388–89, 690 N.Y.S.2d 854, 712 N.E.2d 1220 (1999) (emphasis in original).

■ Paragraphs 4 and 5 of the United Waste Agreement set forth the non-compete provisions. Paragraph 5(a) prohibited Mathias from working for or owning an interest in any competitor business of United Waste. Paragraph 5(b) barred Mathias from having "any contact whatsoever" with three expansive categories of persons and entities, including (1) persons or entities who had, or were prospects for, a business relationship with United Waste; (2) any United Waste employees or officers, or their families; and (3) any company that was a possible acquisition by United Waste. This no-contact clause was effective for two years subsequent to the signing of the Agreements—June 1, 1992 through May 30, 1994.

Mathias and Jacobs agree that the no-contact language is sweeping in design and effect. Mathias was unequivocally precluded from communicating or interacting with the specified categories of persons and entities, irrespective of whether the contact was in connection with United Waste and its legitimate business interests. Jacobs asserts that any violation of the no-contact clause, even an admittedly innocuous one, terminates Mathias's right to exercise the stock options. Jacobs's Memorandum in Support of Summary Judgment ("Jacobs Mem.") at 10–14. Mathias counters that the far-reaching scope of the non-contact clause is invalid and unenforceable. Mathias's Memorandum in Support of Summary Judgment ("Mathias Mem.") at 11–15. This Court agrees.

■ The first prong of the test to evaluate restrictive covenants in employment contracts pertains to whether the restriction had the purpose of safeguarding legitimate business interests. Legitimate business interests include "protection against misappropriation of the employer's trade secrets or of confidential customer lists, or protection from competition by a former employee whose services are unique or extraordinary." *BDO Seidman,* 93 N.Y.2d at 389, 690 N.Y.S.2d 854, 712 N.E.2d 1220; *Ticor Title Ins. Co.,* 173 F.3d at 70. Here, there is no allegation that the no-contact clause was necessary in order to prevent Mathias from disclosing confidential information about United Waste or using his inside knowledge of United Waste's operations to compete against it.

In addition, while the no-contact clause is circumscribed by a time limitation, it is conspicuously devoid of a subject matter limitation that describes the kinds of communication and interaction would injure United Waste. The plain language of Paragraph 5(b) proscribes Mathias from having "any contact whatsoever" with the three particular categories of persons and entities. Thus, Paragraph 5(b) precluded Mathias from contacts that were entirely inoffensive, such as social contacts, and from contacts that could help him establish a new professional career outside of the waste management industry, such as with bankers, lenders, and venture capitalists.

### 2. *Analysis of Options Agreement as an Ordinary Commercial Contract*

Even if construed as an ordinary commercial contract, the non-compete provision is unenforceable. The "simple rule of reason" analysis differs from the employment contract test by according more deference to the parties' freedom to contract. This does not mean, as Jacobs suggests, that the Agreement memorialized by the parties must be enforced strictly according to its terms. On the contrary, the "simple rule of reason" still embraces consideration of the factors entailed in the employment contract test, including protection of legitimate business interests and the hardship imposed upon the former employee.

As described above, the sweeping no-contact clause was not necessary to protect United Waste's business interests and it unduly burdened Mathias's ability to earn a living.

## D. *JACOBS'S AFFIRMATIVE DEFENSES*

### 1. *Duress*

Jacobs asserts the affirmative defense that he entered the agreements under duress caused by Mathias's threats of economic interference and physical violence. Jacobs described an "atmosphere of threats and intimidation" during the period that he and Mathias negotiated the agreements. Examination Before Trial of Jacobs ("Jacobs Dep.") at 198, excerpt attached as exhibit 3 to Affirmation of Steven Feldman (counsel for Jacobs) dated May 16, 2000. Jacobs depicts Mathias as a dangerous man with ties to indicted Serbian war criminals. Jacobs's Memorandum in Opposition to Summary Judgment ("Jacobs's Mem. in Opp'n to Summ.J.").

Jacobs's deposition testimony is replete with examples of Mathias's allegedly threatening behavior during the period in which they were discussing Mathias's termination. For instance, Jacobs claims that Mathias brought a cast of unsavory characters to the United Waste offices, including his cousin "Zoran," who is characterized as a gun-toting mafia contract killer and "Little Mike", who "also was described as basically a thug, and frankly made a convincing performance." Jacobs Dep. at 198. Perhaps the most menacing Mathias associate was a boxer allegedly employed by Mathias to extort money out of Jacobs. Jacobs Dep. at 197–98. The boxer purportedly arrived unannounced at the United Waste office and poised himself with an intimidating glare before Jacobs. *Id.* The boxer left only after Jacobs called Mathias and threatened to call the police. *Id.*

Jacobs portrays Mathias as possessing a generally violent temperament not limited to their discussions of Mathias's termination from United Waste. For example, Jacobs recounts an episode in which Mathias became belligerent with a driver, who Mathias believed was taking too long pumping gas at a gas station. The deposition testimony of John Milne, a United Waste senior officer during Mathias's tenure there, corroborates Jacobs's deposition testimony and adds to Mathias's character composition. Milne stated that he considered Mathias to be a threatening person "primarily due to the stories and information that Mike told us" about his "violent lifestyle." [1] Milne Dep. at 80–81. Finally, Jacobs buttresses his allegation of Mathias's violent personality by associating Mathias with the tumult in the former Yugoslavia. Jacobs attaches as an exhibit an excerpt from a book which identifies Nenad Matjasevic (Mathias's former name) as an "operative in charge" of carrying out apparent terrorist acts against Croatia.[2] Jacobs Mem. in Opp'n Summ.J.Ex. 7. Jacobs also notes that contact information for Arkan and Stojiljkovic, two Serbians purportedly indicted for war crimes in connection with the war in the Balkans, was contained in Mathias's Palm Pilot. *Id.* Ex. 11.

In addition to the threat of physical violence, Jacobs asserts that Mathias threatened economic injury to United Waste. Jacobs attaches as an exhibit a

---

**1.** Milne elaborated more specifically that Mathias "would describe going out in the evening and getting involved in fights, beating people up. He would describe how you hit someone, where you hit someone, you know, what knife is a good knife." Milne Deposition ("Milne Dep.") at 82.

**2.** The book is *Clan of Kucan* by Danilo Slivnik.

letter he wrote to Mathias in April 1992, when discussions regarding the Severance Agreements were underway. Jacobs Mem. in Opp'n Summ.J.Ex. 4. In the letter, Jacobs complained about Mathias coming to United Waste and issuing ultimatums about hiring "a Mob-connected lawyer . . . to file frivolous lawsuits against the Company and individuals here, to defame, to hurt the Company's business generally, to 'squeeze' the Company . . ."

Mathias rejects Jacobs's depiction of him as a violent individual, but he does not disclaim the specific allegations of aggression attributed to him. Even accepting as true all of Jacobs's contentions regarding Mathias's hostile manner, and the corresponding inference that hostility was calculated to induce Jacobs's acquiescence to Mathias's severance demands, this Court is not persuaded that such generalized character traits necessarily translate into impermissible duress in connection with the particular transaction at issue here. A critical nexus is lacking.

▆▆ In order to make out a claim of duress as an affirmative defense to breach of contract, a defendant must show that he was subjected to compulsion that was sufficiently great "to overcome the exercise of [his] free will." *Gerstein v. Broad Hollow Rd. Co.*, 75 A.D.2d 292, 429 N.Y.S.2d 195, 199 (1st Dep't 1980). The duress "must 'involve an act or a threat of action from which the person sought to be influenced is entitled to be free.'" *Id.* (quoting *Kazaras v. Manufacturers Trust Co.*, 4 A.D.2d 227, 164 N.Y.S.2d 211, 220 (1st Dep't 1957)). A defendant claiming that he was induced to enter a contract as a result of duress must show: (1) a threat, (2) unlawfully made, (3) which caused involuntary acceptance of contractual terms, (4) because the circumstances permitted no alternative. *Industrial Recycling Systems, Inc. v. Ahneman Associates*, 892 F.Supp. 547, 549 (S.D.N.Y.1995). A duress defense

is evaluated according to an objective standard. *Eisenstein v. Kelly Music & Entertainment Corp.*, No. 97 Civ. 4649, 1998 WL 289734, at *4 (S.D.N.Y. June 4, 1998).

▆▆ As described above, Jacobs maintains that the Options Agreement is voidable because Mathias coerced him into signing it through threats of physical and economic injury. Even accepting as true Jacobs's contention that Mathias made threats, the Court is not persuaded that Jacobs's duress defense raises a genuine issue of material fact sufficient to defeat Mathias's summary judgment motion. Jacobs and Mathias were experienced businessmen who were no strangers to one another. Rather, they had known each other for many years, and had many occasions to work together and socialize prior to their relationship at United Waste. Moreover, both men were represented by counsel in the negotiations over the Agreements.

In light of their long-term business and social relationship, a reasonable jury could not conclude on the record before the Court that Jacobs was so threatened by Mathias than he was robbed of his free will and forced to assent to the Options Agreement. Most of the evidence Jacobs marshals with respect to Mathias's violent temperament either does not manifest a specific threat of harm directed at Jacobs or is totally unrelated to the parties' business relationship and appears to be entirely unconnected to the circumstances leading to the matter of the Options Agreement. For example, while a conceivable inference could be drawn that the allegedly sordid associates that Mathias received at United Waste's offices and introduced to Jacobs may have been used as a ploy to intimidate Jacobs into granting the stock options, there is no evidence or even an allegation that any of these persons actually threatened Jacobs or the

Company. Nor is there sufficient hard evidence from which a rational trier of fact could reasonably conclude that at the time he signed the Options Agreement, Jacobs was under some direct threat of harm that deprived him of his ability to enter into the contract through an independent act of his own free will, and left him no choice but to sign the Agreement. Moreover, while Mathias's claimed paramilitary activities in the former Yugoslavia and his acquaintance with indicted war criminals may raise questions about his character, they bear no relationship to the instant dispute.

Most importantly, Jacobs's assertion of duress is belied by his own conduct. In the episode he relates involving Mathias's boxer friend, the alleged attempt at intimidation apparently did not succeed as Jacobs did not hesitate to call Mathias and tell him to instruct his friend to leave. During the course of negotiations over the Agreements, Jacobs did not mince words in informing Mathias that his attorney's proposal was untenable. In a faxed letter dated May 26, 1992, Jacobs stated unequivocally, "If you want to spend time discussing the reasons why all the other changes are not workable, I am perfectly happy to go over it with you, although I am not sure what purpose it would serve, because I can already tell you they won't work." Jacobs Opp'n Mem.Ex. 12. This statement is hardly indicative of one whose capacity to exercise his free will has been overcome. Jacobs closed the letter on an amicable tone with "I hope things are going well with you in general."

Jacobs's allegation of economic duress fares no better. Jacobs's April 3, 1992

letter to Mathias records threats that Mathias allegedly issued with respect to how he would interfere with United Waste's business.[3] Even accepting as true Jacobs's contention that Mathias made these threats, Mathias's behavior still does not rise to the legal standard of duress. For example, in the same letter in which he set forth Mathias's threats, Jacobs offered "to meet ... to try to discuss your problem and our permanent separation...." This invitation rebuts Jacobs's own contention that, under the objective standard by which the duress defense is assessed, he was exposed to coercion that deprived him of his free will and left him with no choice but to sign the Options Agreement.

The Court's finding that the factual circumstances Jacobs describes do not satisfy the requirements for duress is bolstered by the rulings of other courts applying the same standards. In *Lucas v. Oxigene, Inc.*, No. 94 Civ. 1691, 1995 WL 520752, at *6 (S.D.N.Y. Aug. 31, 1995), the court held that a plaintiff CEO contesting an employment contract was merely subjected to hard bargaining, and not duress, when the Chief Financial Officer of the corporation allegedly used "alarm tactics" to induce the plaintiff into signing the agreement. According to the plaintiff, the CFO told him that his failure to assent to the agreement would jeopardize the IPO, in which the plaintiff had invested a substantial amount of his own money. The court found that the plaintiff's allegation did not demonstrate that the CFO's conduct was "so severe that it deprived plaintiff of his free will and judgment." Similarly, in *Bekhor v. Josephthal Group, Inc.*, No. 96 Civ. 4156, 2000 WL 1521198, at *3–*4

---

**3.** The letter reads in pertinent part: "On Thursday you came into our office acting like Al Pacino and were full of all kinds of threats and ultimatums—to hire a Mob-connected lawyer on a contingency basis to file frivolous lawsuits against the Company and individuals here, to defame, to hurt the Company's business generally, to 'squeeze' (to use your word) the Company and people here, to 'take away' from the Company what you referred to as *your* asbestos business, ..." Jacobs Mem. in Opp'n Summ.J.Ex. 4.

(S.D.N.Y. Oct.13, 2000), the court ruled that even though the plaintiff might have felt "shell-shocked and traumatized" during negotiations of a contract, his claim of duress failed because he did not show that he had no alternative but to sign the contract.

While the Court does not doubt that Mathias's conduct during the period of the negotiations could have engendered some psychological or business distress in Jacobs, "distress" does not equate with legal "duress." Jacobs has not shown that he was subjected to a degree of compulsion that eliminated the exercise of his free will and forced him to sign the Options Agreement.

In addition, a party who has entered into a contract due to duress must act promptly to repudiate it. *See VKK Corp. v. Nat'l Football League,* No. 99–7876, 2001 WL 328223, at *6 (2d Cir. April 2, 2001). Failure to act quickly in repudiating a contract may be construed as ratifying it. *See DiRose v. PK Mgmt. Corp.,* 691 F.2d 628, 633 (1982); *Sheindlin v. Sheindlin,* 88 A.D.2d 930, 450 N.Y.S.2d 881, 881 (2d Dep't 1982). "The burden on a party seeking to avoid contractual obligations on the grounds of economic duress 'increases proportionately with the delay in initiating suit or otherwise repudiating the contract in question, since it is well established under New York law that a party asserting duress must do so promptly.'" *VKK Corp. v. Nat'l Football League,* —— F.3d ——, 2001 WL 328223, at *6 (quoting *Int'l Halliwell Mines, Ltd. v. Cont'l Copper and Steel Indus., Inc.,* 544 F.2d 105, 108 (2d Cir.1976)). However, the party alleging duress is under no obligation to repudiate the contract until the duress has ended. *Sosnoff v. Carter,* 165 A.D.2d 486, 568 N.Y.S.2d 43, 47 (App.Div.1st Dep't 1991).

Although the Court finds that Jacobs has not sufficiently established duress, it further notes that even if Jacobs had successfully met the requisite legal standard for this defense, he still would not defeat Mathias's summary judgment motion because no reasonable jury could conclude that Jacobs timely repudiated the contract.

Jacobs testified in his deposition and stated in response to an interrogatory that sometime between January and April 1995, discussions took place between Mathias and him and their respective attorneys regarding the Options Agreement. Jacobs Dep. at 329; Jacobs Response to Second Set of Interrogatories at 2. Later that year, "towards near the middle of 1995," Jacobs claims that Mathias offered to relinquish his right to exercise the options. Jacobs Dep. at 329. Assuming that Mathias did indeed declare his intention to cancel the Options Agreement, and Jacobs accepted it, this repudiation came at least three full years after the Options Agreement was consummated in 1992. This delay is too much time to have elapsed for Jacobs to have effectively preserved his economic duress defense. *See VKK Corp.,* 2001 WL 328223 (holding that plaintiff forfeited claim of economic duress by waiting thirty months to assert it; also citing to *DiRose v. PK Management Corp.,* 691 F.2d 628, 633–34 (2d Cir.1982) for the proposition that "delays as short as six months have been held to constitute forfeiture of the claim."); *2 Broadway LLC v. Credit Suisse First Boston Mortgage Capital LLC,* No. 00 Civ. 5773, 2001 WL 410074, at *12 (S.D.N.Y. Apr.23, 2001) (finding that although there was no duress, the plaintiffs' delay of ten months in alleging economic duress constituted a waiver of the claim).

Moreover, there is no indication here that any effort by Jacobs to repudiate or renegotiate the Options Agreement in 1995 was prompted by concern that it had been procured by duress. Had that been the

prime motivation, it is hardly one that the party asserting duress as grounds for repudiation would keep secret. There is no evidence whatever on this record that Jacobs at any time expressed as grounds for purportedly repudiating the Options Agreement that he had been robbed of his free will in executing it in the first place.

### 2. *Improper Tender*

In his cross-motion for summary judgment, Jacobs argues that Mathias made an improper tender when he sought to exercise his options because he requested delivery of 860,000 shares of United Waste stock, as opposed to the 191,111.09 shares he was entitled to under the Options Agreement. Jacobs Mem.Supp.Summ.J. at 22–24. Jacobs contends that Mathias's exercise letter therefore constituted a counteroffer which Jacobs was empowered to reject. *Id.* Moreover, Jacobs states that if he had accepted Mathias's exercise letter, he would have been obligated to deliver the 860,000 shares, as opposed to the 191,111.09 that the Options Agreement actually called for. *Id.*

■ Under New York law, "in order to validly exercise an option to purchase real property, the optionee must strictly adhere to the terms and conditions of the option agreement." *D.A.D. Restaurant, Ltd. v. Anthony Operating Corp.*, 139 A.D.2d 485, 526 N.Y.S.2d 590, 590 (App.Div.2d Dep't 1988). Jacobs cites to this proposition as the linchpin of his argument. However, he ignores that this statement of the law has been invoked in cases in which courts have held that the optionee's rights under the contract expired because they violated express terms of the contract, such as those pertaining to the time and method of performance. *See e.g., D.A.D. Rest., Ltd.*, 526 N.Y.S.2d at 590; *T.I.P. Holding # 2 Corp. v. Wicks*, 63 A.D.2d 263, 407 N.Y.S.2d 709, 713 (App.Div.2d Dep't 1978); *Bresnan v.*

*Bresnan*, 156 A.D.2d 532, 548 N.Y.S.2d 803, 804 (App.Div.2d Dep't 1989).

■ In the case at bar, Mathias complied with the provisions specifying how he was to exercise the options. Paragraph 1 of the Stock Options Agreement provides:

BJ hereby grants to NM the right and option (the "Option"), exercisable by notice accompanied by payment in full of the option exercise price, to acquire from BJ 400,000 shares of Stock at an exercise price of $3.00 per share. The Option shall be exercisable exclusively during the period commencing June 1, 1994 and ending May 31, 1999.

Paragraph 3 provides:

In the event that the outstanding shares of Stock of the Company are at any time increased or decreased or changed into or exchanged for a different number or kind of share or other security of the Company or of another corporation through reorganization, merger, consolidation, liquidation, recapitalization, stock split, combination of shares or stock dividends payable with respect to such Stock, appropriate adjustments in the number and kind of such securities then subject to the Option shall be made effective as of the date of such occurrence so that the position of NM upon exercise will be the same as it would have been had he owned immediately prior to the occurrence of such events the Stock subject to the Option.

It is undisputed that on March 8, 1999, Mathias personally delivered to Jacobs a letter ("Exercise Letter") notifying Jacobs of Mathias's exercise of the options. The Exercise Letter complied with the three material requirements of Paragraph 1 in that it (1) provided notice to Jacobs, (2) was accompanied by a check for $1.2 million, and (3) was tendered within the period prescribed. Mathias also complied with Paragraph 3 in that he clearly set forth in

the Exercise Letter his calculations with respect to the number of shares to which he was entitled based upon the changes in the stock. For reasons unknown, however, Mathias miscalculated by failing to consider the 4 to 1 reverse split that occurred in October 1992. Consequently, in his Exercise Letter, Mathias requested delivery of 860,000 shares of stock, instead of the 191,111.09 to which he was actually entitled.

New York courts have stated that "an exact and unconditional acceptance of an offer is not afterward turned into a conditional acceptance or counteroffer so as to prevent the formation of a contract, by an improper interpretation of the terms of the agreement by one of the parties." *In re Estate of Leo K. McManus*, 83 A.D.2d 553, 440 N.Y.S.2d 954 (App.Div.2d Dep't 1981). This statement aptly describes Mathias's exercise of the options. Mathias adhered to the performance requirements of the Options Agreement and Jacobs unequivocally understood that Mathias was tendering performance. There is no evidence to suggest that Mathias would not have responded appropriately to a revised computation of the shares to which he was entitled, if Jacobs had appraised him of the error. Thus, Jacobs's improper tender defense fails.

### E. *JACOBS'S COUNTERCLAIM*

In his Amended Answer, Jacobs raises as a counterclaim a $50,000 loan he made to Mathias around September 1998 in response to an urgent phone call from Mathias in Kosovo. Jacobs Am. Answer ¶¶ 29–35. Jacobs testified in his deposition that Mathias claimed he was being held against his will in Kosovo and that his captors were demanding a ransom. Jacobs Dep. at 346–347. Mathias explained in his deposition that the driver of his car had taken a wrong turn into "enemy territory," and since he and the other passengers spoke Serbian, they were detained against their will until they proffered the demanded ransom. Mathias Dep. at 200–01. Mathias ultimately paid $200,000 to secure his release, $50,000 of which he acknowledges was contributed by Jacobs. Mathias Dep. at 201–03. Jacobs testified that when Mathias solicited the $50,000, he stated that he could "pay it back within a few weeks." Jacobs Dep. at 347. Mathias does not dispute that he made this representation, but he alleges that he attempted to recompense Jacobs, but Jacobs told him not to worry about it. Mathias Dep. at 207. Jacobs argues that any damages for which he is held accountable to Mathias should be offset by the $50,000 loan.

Fed.R.Civ.P. 13(a) requires a party to plead any claim it has against the opposing party that "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction." In addition to compulsory counterclaims, Rule 13 also provides for the pleading of permissive counterclaims. Under Rule 13(b) a party may plead any claim against the opposing party that does *not* emanate from the transaction or occurrence that forms the subject matter of the primary claim. Federal courts retain ancillary jurisdiction over compulsory counterclaims but permissive counterclaims must be grounded in an independent jurisdictional basis in order to avoid dismissal.

In the instant case, Jacobs concedes that his counterclaim is permissive in nature because it does not pertain to the breach of the Options Agreement which forms the primary claim. Jacobs Mem. in Opp'n Summ.J. at 24–25. Mathias contends that Jacobs's counterclaim cannot stand because it fails to satisfy the amount in controversy threshold for federal court diversity subject matter jurisdiction.

Mathias Mem.Supp.Summ.J. at 24. Jacobs responds that the counterclaim may be adjudicated under an exception to the independent jurisdiction requirement of permissive counterclaims. Jacobs Mem. in Opp'n Summ.J. at 24–25.

■ Defensive set-offs, or claims to reduce the plaintiff's damages, rather than secure affirmative relief, are the exception to the jurisdiction rule. *Wigglesworth v. Teamsters Local Union No. 592,* 68 F.R.D. 609, 612 (E.D.Va.1975); *United States v. Thermo Contracting Corp.,* 437 F.Supp. 195, 199 (D.N.J.1976); 3 *Moore's Federal Practice,* § 13.31 (Matthew Bender 3d ed.). Jacobs's permissive counterclaim qualifies as a set-off under the relevant four-prong test: (1) the subject of the counterclaim is a transaction extrinsic to the primary claim; (2) at $50,000, the amount in controversy is liquidated (or capable of liquidation); (3) the counterclaim grows out of a contract (it may also stem from a judgment); and (4) the counterclaim is interposed defensively to reduce the amount of Mathias's recovery. *Dinces v. Robbins,* 604 F.Supp. 1021, 1027–28 (E.D.Pa.1985); 32A *Am.Jur.2d* § 698 (1995).

While Jacobs successfully avoids dismissal of his counterclaim on jurisdictional grounds, he does not prevail in reducing Mathias's recovery. Jacobs fails to provide admissible evidence rebutting Mathias's contention that Jacobs relieved him of the obligation to reimburse the loan. It is a basic cornerstone of the summary judgment motion that the non-movant must rebut each of the movant's allegations. Jacobs does not state in an affidavit or testify in a deposition, or offer any other evidence, that he never forgave the loan. This deficiency compels the defeat of Jacobs's counterclaim.

### F. *REMEDIES*

■ Jacobs argues that if the Court determines that the no-contact clause is unenforceable, it should declare the whole contract unenforceable and dismiss the complaint. Jacobs maintains that the no-contact clause and the right to exercise the stock options were mutually dependent promises, such that the invalidity of the former renders the latter equally invalid.

The Restatement (Second) of Contracts, § 184 provides: "If less than all of an agreement is unenforceable, a court may nevertheless enforce the rest of the agreement . . . if the performance as to which the agreement is unenforceable is not an essential part of the agreed exchange." Restatement (Second) of Contracts § 184 (1981). Thus, the decisive issue this Court must resolve is whether the no-contact clause was the heart of the Options Agreement. For the reasons described herein, the Court concludes that the unenforceability of the no-contact clause does not render the remainder of the Options Agreement inoperative. Therefore, Mathias is entitled to recover damages.

In his deposition, Jacobs indeed testified that the no-contact clause was "perhaps the kernel of what we bargained for" Jacobs Dep. At 286. While Jacobs clearly employs the term "kernel" as signaling the central or essential part of the Options Agreement, it aptly illuminates the fact that the no-contact clause was simply a single part of the Agreement, and that Mathias gave other valuable consideration in exchange for the stock options.

Jacobs cites to two cases in which courts refused to enforce severance contracts after invalidating restrictive covenants. *See Sheline v. Dun & Bradstreet Corp.,* 948 F.2d 174 (5th Cir.1991); *Alston Studios, Inc. v. Lloyd V. Gress & Assocs.,* 492 F.2d 279, 285 (4th Cir.1974). However, these cases are distinguishable from the instant dispute. In *Sheline* and *Alston Studios,* the former employees breached the non-competition provisions contained in their

termination contracts by accepting employment with competitor businesses. Although the non-competition provisions were held to be unenforceable, the courts determined that the provisions and the severance benefits were so interwoven that the one could no stand without the other. That is not the situation here.

There is no allegation that Mathias breached the Options Agreement by working for, or in any way associating with, any competitor of United Waste (in fact, as noted above, those non-competition provisions barring Mathias from working for, advising, etc., United Waste competitors are not even under review here). Hence, Mathias relinquished the right to engage in an activity (employment in the waste management industry) that was otherwise available to him, in order to obtain the stock options. Similarly, Mathias's promise benefitted Jacobs by guaranteeing that United Waste competitors would not be advantaged by the skills and expertise Mathias accrued at United Waste. The Court concludes that nullifying the entire contract would be an extreme remedy unwarranted by the factual situation here.

Since the period for performance has expired, Mathias's summary judgment motion is granted as to liability. There is not sufficient evidence in the record with respect to damages, however, for this Court to conclude that there is no triable issue of material fact.

### III. *DEPOSITION SANCTIONS*

#### A. *BACKGROUND*

The Court now addresses Jacobs's objections to the sanctions awarded against his counsel by Magistrate Judge James Francis for discovery abuse in the depositions of Richard Weingarten ("Weingarten") and Alfred DelBello ("DelBello"). Magistrate Judge Francis ordered Jacobs's counsel to pay sanctions in the amount of $1,723.90. This amount covered Mathias's attorneys's fees, the witnesses's time in sitting for the depositions, and the cost to Mathias's attorneys of procuring a copy of the videotape made of DelBello's deposition.

Weingarten is a semi-retired attorney. He is a former Judge of the Yonkers City Court and the former Chairman of the Westchester County Democratic Committee. He is also the father of Mark Weingarten, Mathias's counsel of record in this action. Mathias Memorandum in Opposition to Jacobs's Objections to the Magistrate Judge Memorandum and Order ("Mathias Mem. in Opp'n to Objections to Magistrate Judge's Mem") at 16. Weingarten has appeared "of counsel" in this case on two occasions, including a session of Jacobs's deposition testimony on September 8, 1999 and a court conference on September 10, 1999. *Id.* Weingarten was served with a subpoena on January 8, 2000, and his deposition took place on January 14, 2000. Mathias Motion in Support of Deposition Sanctions ("Mathias Motion Supp.Dep. Sanctions") Ex. A.

DelBello is a former Councilman and Mayor of the City of Yonkers, former County Executive of the County of Westchester, and former Lieutenant Governor of the State of New York. Mathias Mem. in Opp'n to Objections to Magistrate Judge Mem. at 14. He is also a partner in the law firm representing Mathias. DelBello was served with a subpoena on December 24, 1999 and deposed on January 11, 2000. Mathias Mem. in Opp'n to Objections to Magistrate Judge Mem. at 14; DelBello Deposition ("DelBello Dep.") at 1.

Prior to the scheduled depositions, the parties exchanged letters in which they contested the relevance of Weingarten's and DelBello's testimony to the instant action. Jacobs insisted that there was a reasonable basis for believing that both witnesses possessed information applicable

to his improper contacts and duress defenses.

With respect to the improper contacts defense, Jacobs argued that Mathias's testimony indicated that between 1989 and 1992, Weingarten and DelBello worked with waste companies, with which United Waste hoped to develop business relationships. Letter of Leslie A. Lupert ("Lupert Letter"), Mathias Motion Supp.Dep.Sanctions Ex. C. Since Mathias admitted in his deposition to having contact with Weingarten and DelBello during the prohibited period, Jacobs apparently wished to corroborate Mathias's testimony by exploring the nature of the prospective deponents' relationships to United Waste. *Id.*

As to the duress defense, Jacobs argued that Mathias identified Weingarten and DelBello as the attorneys with whom he dealt during the period in which he threatened to hire a "mob-connected lawyer" to bring frivolous lawsuits against Jacobs and United Waste. Lupert Letter. Jacobs evidently wished to determine if either Weingarten or DelBello was the attorney to whom Mathias referred.

Mathias did not seek to prohibit the examination of DelBello, but on January 10, 2000, he filed a letter application with Magistrate Judge Francis to obtain a protective order under Fed.R.Civ.P. 26(c) to bar Weingarten's deposition. Letter of Patrick M. Reilly ("Reilly Protective Order Letter"), Mathias Reply Motion in Support of Deposition Sanctions ("Mathias Reply Motion Supp.Dep. Sanctions") Ex. A. Mathias argued that Weingarten had "no knowledge of any facts or circumstances potentially relevant to any issue in this case, and defendant lacks any good faith basis for asserting otherwise." *Id.* To support this assertion, Mathias maintained that (1) except for the two "of counsel" appearances in the instant action, Weingarten had never represented Mathias; (2) Weingarten had never represented Jacobs or United Waste; (3) Weingarten was not involved in the negotiation of the United Waste and Options Agreements, and, indeed, he was a sitting judge at the time they were consummated; and (4) Weingarten had never represented any person or entity listed in the document demand attached to the deposition subpoena. *Id.*

Magistrate Judge Francis denied Mathias's application for a protective order, but, apparently skeptical of Jacobs's motivations in pursuing Weingarten's deposition, he imposed the condition that "if the deposition fails to elicit substantial relevant information, defendant's counsel shall pay all costs and expenses of the deposition, including attorneys' fees, travel expenses, and reimbursement of Mr. Weingarten for his time." Memorandum Endorsement, Mathias Reply Motion Supp.Dep. Sanctions Ex. A.

On February 4, 2000, Mathias moved for the imposition of sanctions against Jacobs for conducting the Weingarten and DelBello depositions "for the improper purpose of harassing, embarrassing and abusing these witnesses, and as a thinly veiled attempt to intimidate plaintiff." Mathias Motion Supp.Dep. Sanctions at 2.

## B. *MAGISTRATE JUDGE FRANCIS'S MEMORANDUM AND ORDER*

### 1. *Weingarten Deposition*

Magistrate Judge Francis issued his Memorandum and Order on July 28, 2000. With respect to the Weingarten deposition, Magistrate Judge Francis determined that Jacobs had failed to satisfy the "substantial relevant information" condition. Magistrate Judge Memorandum and Order ("Magistrate Judge Mem. and Order") at 38–39. According to Magistrate Judge Francis, nothing pertinent to the improper contacts defense was gleaned from the deposition because Weingarten testified that

he never represented United Waste or any client in the waste industry. *Id.;* Weingarten Dep. at 21–23. Moreover, Magistrate Judge Francis found that Weingarten did not otherwise fall into any of the categories of prohibited contacts specified in the Agreements. Magistrate Judge Mem. and Order at 39.

Magistrate Judge Francis acknowledged that there was a reasonable basis for deposing Weingarten as to the duress defense since Jacobs had testified in his deposition that he believed Weingarten was the "mob-connected lawyer" to whom Mathias referred in his alleged threat. Magistrate Judge Mem. and Order at 39–40. However, Magistrate Judge Francis held that Jacobs forfeited this rationale for defending against the sanctions motion because his counsel failed to pose a single question with respect to Weingarten's possible ties to organized crime. *Id.* at 40.

Finally, Magistrate Judge Francis held that Jacobs waived the right to challenge the imposition of the condition because he failed to comply with Fed.R.Civ.P. 72(a). Rule 72(a) provides that orders issued by a magistrate judge in matters not dispositive of a claim or defense of a party must be appealed within ten days of service of the order upon the party. If the party fails to timely appeal, it cannot subsequently claim that the magistrate judge's order was erroneous. Thus, according to Magistrate Judge Francis, Jacobs was obligated to appeal from the order conditioning the Weingarten deposition within ten days of its issuance; Jacobs's failure to timely object barred him from challenging the appropriateness of the condition.

### 2. *DelBello Deposition*

With respect to the DelBello deposition, Magistrate Judge Francis accepted that questions regarding the improper contacts defense were appropriate because DelBello advised United Waste about developing its business relationships. Magistrate Judge Mem. and Order at 40. Therefore, DelBello was a person Mathias was prohibited from contacting during the two-year period subsequent to the signing of the Agreements.

Conversely, Magistrate Judge Francis insisted that there was no reasonable basis for examining DelBello about the duress defense, because Jacobs identified Weingarten as the "mob-connected lawyer" he believed Mathias threatened to employ. Magistrate Judge Mem. and Order at 40. Magistrate Judge Francis characterized three categories of questions posed by Jacobs's attorneys as improper and designed exclusively "to embarrass the witness." *Id.* at 41. These included inquiries about financial contributions to DelBello's election campaigns in the 1970's, a disgraced former business associate of DelBello's wife, and allegations that DelBello improperly exerted his political influence in the awarding of a government contract. *Id.*

### C. *AUTHORITY TO IMPOSE SANCTIONS*

Fed.R.Civ.P. 72 establishes the standard of review trial court judges must apply in considering the orders of magistrate judges. The Rule states that in non-dispositive matters, "the district judge to whom the case is assigned shall consider such objections and shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law."

In *Sheikhan v. Lenox Hill Hospital,* 98 Civ. 6468, 1999 WL 386714, *2 (S.D.N.Y. 1999), the court described the clearly erroneous standard as imposing a "heavy burden" on a party seeking to challenge the ruling of a magistrate court judge. The court noted that "magistrate judges are afforded broad discretion and reversal is

only appropriate if there is an abuse of discretion."

The Federal Rules of Civil Procedure envision liberal pre-trial discovery. Discovery serves important purposes, such as avoiding surprise, fully disclosing the nature and scope of the controversy, narrowing, simplifying, and framing the issues involved, and enabling parties to obtain the factual information needed to prepare for trial. Rules governing discovery should be interpreted broadly to achieve those purposes. *See Gary Plastic Packaging Corp. v. Merrill Lynch,* 756 F.2d 230 (2d Cir. 1985).

Magistrate Judge Francis indicated that his sanctions order against Jacobs was authorized by both Fed.R.Civ.P. 26(g) and the court's inherent power. Magistrate Judge Mem. and Order at 34–36.

Rule 26(g) requires that at least one attorney affix a signature to all discovery requests, responses, and objections. The signature certifies that the discovery request, response, or objection is "warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law;" is not "interposed for any improper purpose;" and is "not unreasonable or unduly burdensome or expensive."

■ Even if the Federal Rules or a statute provides an adequate basis for imposing sanctions, a court still may resort to its inherent power as the source of the sanctions, but the Supreme Court has expressed a preference for the imposition of sanctions under the Federal Rules, when possible. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 50, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) ("When there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power."). Courts are endowed "by their very creation, with power to impose silence, respect, and decorum." *Chambers,* 501 U.S. at 43, 111 S.Ct.

2123 (quoting *Anderson v. Dunn,* 6 U.S. (Wheat.) 204, 227 (1821)). However, because the inherent power is considered so potent, courts must be restrained in exercising it. *Id.* at 44, 111 S.Ct. 2123.

■ Among the circumstances in which a court may impose sanctions in the form of attorneys's fees is when a party has " 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.' " *Chambers,* 501 U.S. at 45–46, 111 S.Ct. 2123. A court should be especially circumspect in imposing this type of sanction due to its stigmatizing effect upon the censured attorneys. *Agee v. Paramount Communications, Inc.,* 114 F.3d 395 (2d Cir.1997) ("A sanctions award implicates the reputational interests of the attorney—his primary asset ...."). Moreover, the inherent power must be employed with temperance "to ensure ... that fear of an award of attorneys' fees against them will not deter persons with colorable claims from pursuing those claims ..." *Oliveri v. Thompson,* 803 F.2d 1265, 1272 (2d Cir.1986).

■ In the Second Circuit, the invocation of a court's inherent power to sanction requires a finding of bad faith. *Oliveri,* 803 F.2d at 1272. The bad faith standard entails a showing "that the challenged actions 'are entirely without color, and are taken for reasons of harassment or delay or for other improper purposes' and 'a high degree of specificity in the factual findings of the lower courts.' " *Id.* (quoting *Dow Chemical Pacific Ltd. v. Rascator Maritime S.A.,* 782 F.2d 329, 344 (2d Cir. 1986)).

In *Revson v. Cinque & Cinque,* 221 F.3d 71 (2d Cir.2000), the Second Circuit demonstrated that the bad faith standard is not easily satisfied. There, the court overturned the trial court's award of sanctions against the plaintiff's attorney. Writing for the unanimous panel, Judge Kearse found the following conduct by the plain-

tiff's attorney not sanctionable: (1) "writing a letter to the defendant attorney Cinque threatening to tarnish his reputation and subject him to the legal equivalent of a proctology exam"; (2) "publicly accusing Cinque of fraud without any concrete evidence to support the claim"; (3) "threatening to send a letter to the court accusing Cinque of criminal conduct if he did not capitulate to [the plaintiff's] demands"; and (4) "repeatedly attacking Cinque in an offensive and demeaning fashion, including calling Cinque a lawyer who . . . has acted in a manner that shames all of us in the profession, a disgrace to the legal profession, and an example of why lawyers are sometimes referred to as snakes . . ." *Revson*, 221 F.3d at 77 (internal quotations omitted). Any fair assessment of this conduct would concur that the lawyer's extreme language and tactics there sank as close to the threshold of the gutter as imaginable and still escape judicial sanctions. How much lower such conduct could have descended before becoming punishable is difficult to fathom. Suffice it to say that *Revson* sets the low water mark defining the ethical and professional behavior on the part of an attorney that passes muster immune from discipline. If the example of *Revson* is to serve as the model to guide determinations of the limits of aggression and offense deemed acceptable advocacy for a lawyer, this Court can not in good conscience find that the practices of Jacobs's counsel that the Magistrate Judge sanctioned here begin to wallow even in the shallow depths of what is permissible.

## D. *ANALYSIS OF JACOBS'S APPEAL*

In his appeal to this Court, Jacobs continues to argue, as he did before Magistrate Judge Francis, that the depositions of Weingarten and DelBello were relevant to both of his asserted defenses and that the questioning was carried out properly and absent any nefarious purpose.

### 1. *Weingarten Deposition*

With respect to the Weingarten deposition, Jacobs asserts that Magistrate Judge Francis's condition requiring Jacobs to obtain "substantial relevant information" was clearly erroneous because it made his counsel responsible for the quality of Weingarten's testimony. Jacobs Memorandum in Support of his Objections to the Magistrate Judge's Memorandum and Order ("Jacobs Mem.Supp. Objections to Magistrate Mem. and Order") at 19. Further, it confronted Jacobs's counsel with a Hobson's choice: if they pursued the Weingarten deposition, they would risk tarnishing their professional reputations, but if they refrained from deposing Weingarten, they would be in dereliction of their duty to vigorously represent their client Jacobs. *Id.* at 19–20.

Moreover, even if Magistrate Judge Francis's condition was validly imposed, continues Jacobs, his counsel satisfied it. The deposition did indeed produce "substantial relevant information" because Weingarten corroborated Jacobs's recollection of meetings attended by Weingarten in which United Waste business development ventures were discussed. Jacobs Mem.Supp. Objections to Magistrate Mem. and Order at 22–23. Additionally, the deposition confirmed that Weingarten had an of counsel relationship with Robinson Frog, the law firm that formerly represented United Waste. This information demonstrates that Weingarten was a person Mathias was precluded from contacting under the Agreements. *Id.*

Upon review of the record, this Court finds that there was a reasonable basis for pursuing the Weingarten deposition as to both the improper contacts and duress defenses, and that the condition imposed on the taking of the deposition was not warranted. Moreover, this Court finds little evidence that impeaches the motivations of Jacobs's attorneys in seeking the deposi-

tion. Thus, the Court concludes that Rule 26(g) was not violated and that there was not a sufficient showing of bad faith to warrant the imposition of sanctions under the Court's inherent power.

Before delving into a discussion about the "substantial relevant information" condition, the Court addresses Magistrate Judge Francis's ruling that Rule 72(a) precludes Jacobs from challenging the condition. This Court respectfully disagrees. Jacobs's attorneys assert that they received notice of Magistrate Judge Francis's imposition of the condition a mere twenty-two minutes before the deposition was scheduled to commence. Jacobs Mem.Supp. Objections to Magistrate Mem. and Order at 19. Thus, they did not have sufficient opportunity to file an appeal prior to taking the deposition. Appealing during the ten-day period following the issuance of Magistrate Judge Francis's order would have been premature because Jacobs's attorneys were not yet aggrieved by the condition. Jacobs appeals from the imposition of sanctions, not solely the condition put on the deposition.

This Court concurs with Magistrate Judge Francis's finding that there was a sufficient basis for deposing Weingarten as to the duress defense. However, the taking of the deposition did not become sanctionable just because Jacobs's attorneys's did not reach the issue during the actual deposition. While it might seem unusual that Jacobs's attorneys did not query Weingarten about any possible connections to organized crime, that they refrained from asking about relevant subjects does

not mean the validity of those subjects had been surrendered. The taking of a deposition assumes a rhythm and character that informs an attorney's decision about what questions to pose. The quality of a deponent's memory, his degree of cooperation, and the substance of responses to questions already posed help dictate what will be asked. During the course of his deposition, Weingarten claimed that his memory failed him in response to several questions. This memory loss may have convinced Jacobs's attorneys that Weingarten would not be capable of providing probative information on other relevant subjects. Such a conclusion is not without a reasonable basis.

Next, this Court finds that there was a reasonable basis for Jacobs's attorneys to depose Weingarten on the improper contacts defense. Mathias testified that Weingarten may have been among the persons affiliated with DelBello and Mark Weingarten (the deponent's son and Mathias's chief counsel) with whom he had informal contact during the prohibited period.[4] Mathias Dep. at 502–03. Moreover, DelBello testified that it was Weingarten who asked him to meet with Jacobs to discuss the waste management industry, since DelBello had experience in that field. DelBello Dep. at 17. DelBello further testified that Weingarten was present at a meeting at Jacobs's Greenwich, Connecticut home at which United Waste's business development interests were presumably discussed, although DelBello insisted he had no recollection of the precise nature of the conversation.[5] DelBello Dep.

---

**4.** Jacobs's counsel asked: "... when is the next time you had any contact about anything with either Mr. DelBello, Mr. Weingarten, Mr. Richard Weingarten [the deponent] or anybody else you knew to be affiliated with them as a lawyer?" Mathias responded, "I don't remember the dates. There were very few contacts, maybe once or twice a year, unrelated, simply friendly, somebody called or

common friend called up and something happened, but nothing of any substance." Mathias Dep. at 502–03.

**5.** Jacobs's counsel asked: "Did you meet with Mr. Jacobs ...?" DelBello responded: "Yes ... It was at his [Jacobs's] home ... In Greenwich, Connecticut ... Richard was

at 17–20. Finally, DelBello stated that it was either Weingarten or Jacobs who requested that he arrange a meeting between United Waste and another company United Waste was interested in attracting as a client. DelBello Dep. at 23. Thus, both Mathias's and DelBello's testimony provided Jacobs with a reasonable basis for deposing Weingarten with respect to the improper contacts defense. Ultimately, Jacobs's examination of Weingarten proved fruitful along these lines, since Weingarten confirmed his attendance at the meeting at Jacobs's home alluded to by DelBello, and he also recalled being in United Waste's offices overlooking Central Park. Weingarten Dep. at 13–20.

Since the Court finds that it was proper for Jacobs's attorney to pursue the Weingarten deposition as to both the improper contacts and duress defenses, Magistrate Judge Francis's order imposing sanctions on Jacobs's counsel is vacated.

### 2. *DelBello Deposition*

Jacobs argues that Mathias is precluded from challenging the DelBello deposition because Mathias's attorneys did not object during the deposition to the specific questions they regarded as improper. Jacobs claims that at the time of the deposition Mathias objected to only two of the twenty

questions Mathias now cites as improper.[6] Jacobs Mem.Supp. Objections to Magistrate Mem. and Order at 17–19. According to Jacobs, Mathias should have sought relief under Fed.R.Civ.P. 30(d). Rule 30(d) provides that during a deposition, a party or a deponent may apply to the court for an order halting the deposition "upon a showing that the examination is being conducted in bad faith or in such manner as unreasonably to annoy, embarrass, or oppress the deponent or party." Although it is not necessary to the ruling herein, this Court notes that it is not persuaded by Jacobs's argument. Magistrate Judge Francis correctly found that Mathias's attorneys repeatedly interposed expressions of disapproval at questions they deemed irrelevant and offensive. *See* DelBello Dep. at 71–72, 91–93, 99–100, 112–113, 123–127. Moreover, nothing in Rule 30(d) establishes that the only manner in which a party may seek sanctions for allegedly improper deposition conduct is through Rule 30(d). This Court construes Rule 30(d) not as the only mechanism through which a party may object to deposition conduct it deems opprobrious, but rather as providing but one tool for doing so.

As described above, Magistrate Judge Francis regarded as improper three categories of questions put to DelBello:

---

there. Brad Jacobs was there. And I think that was it." DelBello Dep. at 18–19.

**6.** Among the deposition questions that Mathias cites as improper are the following: "Are you aware that there was a report, and this goes way back now, that there was a report issued which led to a Grand Jury investigation relating to Maffia pressure on councilmen in Yonkers?" DelBello Dep. at 89. "At the time that there were hearings of some sort that related to the merger of the police—two police departments in Westchester when you were County Executive, weren't there claims at the time made by a Sharon Annea that you had contacts with organized crime figures?" DelBello Dep. at 94. "Do you know whether

or not this firm, the DelBello Donnellan firm or the Worby DelBello firm, represented people who were at least alleged to have connections with organized crime families?" DelBello Dep. at 96. "The U.S. Attorney in the mid- to late 70's conducted a Grand Jury investigation of your '73 campaign, did he not, U.S. Attorney Fiske? Wasn't one of the things that he looked into allegations that there was a $20,000 contribution to your campaign by or on behalf of Joseph Tenelli?" DelBello Dep. at 110. "Do you think it is appropriate for former government officials to deal directly with the government that they formerly were part of?" DelBello Dep. at 124.

questions about campaign financing, his political influence, and his wife's business associate convicted of fraud. Magistrate Judge Mem. and Order at 41. This Court respectfully disagrees with the Magistrate Judge's ruling. The questions were within the parameters of accepted discovery practice because they were applicable to the duress defense.

Jacobs's counsel posed several questions conceived to discern whether DelBello was affiliated in any way with organized crime. As alluded to by Magistrate Judge Francis, Jacobs's counsel sought to elicit information on this subject through an inquiry regarding an organized crime figure from whom DelBello was rumored to have accepted campaign contributions. DelBello Dep. at 109–13. This Court rejects Magistrate Judge Francis's view that this was terrain upon which Jacobs should not have tread. Since DelBello was a long-time friend and business associate of Weingarten, and since, however wrong or unfounded, allegations that DelBello had connections to organized crime were a matter of public record reported in newspaper accounts, Jacobs had reasonable grounds for pursuing that line of inquiry.

Indeed, Jacobs, in order to substantiate his claim that Mathias's threats induced his acquiescence to the Agreements, was entitled to explore any connections with organized crime that DelBello allegedly had. Conceivably, Jacobs's belief that Mathias was referring to Weingarten as the "mob-connected lawyer" might have been in error. Moreover, it is significant that Jacobs's duress defense is not limited to Mathias's alleged threat to bring frivolous litigation against Jacobs and United Waste; rather, Jacobs also describes Mathias's association with various persons who Jacobs claims the suspected were connected to organized crime. Insofar as these individuals or references to them were used by Mathias to harass and unnerve Jacobs, Jacobs had a reasonable basis for deposing DelBello about any organized crime connections he may have had in order to ascertain if he could shed light on Mathias's alleged affiliation with such persons.

Of course, the Court makes no determination as to the veracity of the organized crime allegations leveled at DelBello that arose in connection with this matter. However unfortunate or groundless they may be, their basis or lack of it is beside the point for the purposes here. The Court is persuaded by Jacobs's argument that these insinuations at least gave rise to a reasonable basis to question DelBello on the matter.

Magistrate Judge Francis also condemned counsel's questions regarding accusations that DelBello improperly exerted his political influence in the granting of a contract and questions about a former business associate of Mrs. DelBello who was convicted of fraud. Jacobs's explanation regarding the pertinence of these questions is plausible and within the bounds of appropriate discovery practice.

First, Jacobs asserts that the questions going to DelBello's political influence were relevant to the improper contacts defense because DelBello was assisting United Waste in developing its business relationships. Jacobs Mem.Supp. Objections to Magistrate Mem. and Order at 16–17. Jacobs explains that part of the consultations regarding business development revolved around how DelBello could assist United Waste in securing a contract with Liberty Environmental Systems. *Id.* at 17; DelBello Dep. at 67–73. Apparently, DelBello was previously involved in helping Liberty obtain a public contract in which unsuccessful bidders claimed that DelBello employed his political influence to deliver the contract to Liberty. DelBello Dep. at 67–73. Thus, Jacobs inquired about this con-

troversy in order to procure more information about DelBello's relationship with Liberty and how that relationship affected DelBello's business development advice to United Waste. The Court deems this a legitimate inquiry.

Second, Jacobs argues that the questions regarding a former business associate of Mrs. DelBello were appropriate because Jacobs was operating on the mistaken belief that DelBello had an interest in his wife's business. Jacobs Mem.Supp. Objections to Magistrate Mem. and Order at 16. Jacobs's argument that he was merely seeking impeachment material in the event that DelBello was called to testify at trial as a hostile witness is credible and an appropriate use of deposition discovery.

Just as with the Weingarten deposition, the Court finds the imposition of sanctions against Jacobs's counsel with respect to the DelBello deposition unwarranted. Consequently, Magistrate Judge Francis's order is vacated as to both depositions.

### ORDER

For the reasons set forth herein, it is hereby

**ORDERED** that Plaintiff Michael Ned Mathias's ("Mathias") motion for summary judgment [44–1] is GRANTED on the issue of liability; and it is further

**ORDERED** that Defendant Bradley Jacobs's ("Jacobs") motion for summary judgment [40–1] is DENIED in its entirety; and it is further

**ORDERED** that the Defendant Jacobs's Objections [68–1] to the Order of the Magistrate Judge dated July 28, 2000 [58–1] are SUSTAINED, and said Order [58–1] is hereby VACATED, and Plaintiff Mathias's request for discovery sanctions dated February 4, 2000 is hereby DENIED; and it is further

**ORDERED** that not later than October 25, 2001, the parties shall submit to the Court a Stipulation with regard to the amount of damages to which plaintiff is entitled consistent with this Decision and Order; and it is finally

**ORDERED** that in the event such Stipulation is not reached by October 25, 2001, the parties are directed to appear at a conference before the Court on October 26, 2001 at 10:00 am in Courtroom 618, United States Courthouse, 40 Foley Square, New York, New York.

**SO ORDERED.**